This morning we have four cases scheduled, three will be submitted on the briefs, one will be argued, but before we begin the arguments, the court will entertain a motion from Judge Prost. Thank you. On the admission of Rachel Lauren Weiner, who is a member of the bar in good standing in the highest court of New Jersey, I have knowledge of her congestions and am satisfied that she possesses the necessary qualifications. I'd just like to say as a personal note, these moments are typically bittersweet for me because swearing in of clerks normally coincides with the termination of their clerkship when they move on to bigger and better things. And it's always a real emotional moment for me because certainly with Rachel and other clerks we develop a friendship and camaraderie that goes beyond and will last well beyond this. Judge Clevenger was just reminding me in the conference room that the first time he met Rachel was when she was sitting back there with a bunch of high school kids she had brought in for us to demonstrate a moot court competition for kids that were participating in the Marshall Brennan Constitutional Law Project. And now she's moved up to the front of the podium and I have every confidence that hopefully not too near future we'll see her one step closer at the podium. She's moving on to a wonderful firm and a wonderful career in law and I enthusiastically sponsor her. After due deliberation, the court grants enthusiastically the motion. Rachel, welcome. If you will face the clerk to take the oath. I swear and affirm that you will report yourself to the determining counsel of this court, uprightly and according to law, that you will support the Constitution of the United States of America. I do. Congratulations. Welcome to the Bar of the United States Court of Appeals. Okay. All right. We will now hear argument in Appeal Number 2010-1098, Ripmax v. Horizon Hobby. Mr. McMahon? Good morning, Mayor. Pleased to be in court. Good morning. This appeal boils down to two issues that need review by this court. The first issue is the claim construction of data storage containing code unique to the receiver, which if modified, will require vacating the summary judgment of non-infringement and vacating the judgment of invalidity under Section 103 due to the failure to allow evidence of commercial success. Mr. McMahon, it seems to me that the patent, the specification, the intrinsic record, and indeed all of the evidence in the record consistently points to the meaning of this expression as being unique. The word unique is used throughout. It seems to me it says what it says and means what it means. Unique is unique. If you had intended for the claim to cover simply a preset code of any sort, wouldn't the patent have said that? I think the patent does define what unique means, and it does mean absolute uniqueness, which is certainly one meaning of uniqueness, but not the older one. And if we look at the patent specification, as indeed we must, we find that code unique to the receivers is retrieved from the data storage. I'm sorry. Well, you had a claim construction theory in the court below that was rejected, and as I understand it, you're not advancing that claim construction here. You've got a revised claim construction. We are trying to articulate the same claim construction with different words. Right, but the claim construction that was rejected below that you offered was rejected on the grounds that you were reading a method step into an apparatus claim, and I didn't see you in your brief to disagree with that analysis of the claim construction that you offered below. Tell me just quickly to refresh my memory, what is your construction of code unique to the receiver? We've proposed in the briefs that code unique to the receiver means a receiver-identifying code which is unique among receiver-identifying codes received on the plurality of radio channels. And then we're having nothing to do with a receiver. You've written receiver out, haven't you, in that claim construction? The magic words in the claim are a code unique to the receiver. So your modified claim construction sounds to me as if you're walking away from the receiver. You're having unique codes that float about somewhere, but they don't land in the receiver. I think our problem is that we're focusing on this one clause, code unique to the receiver, without looking at the claim in its entirety. Because claim one in its entirety includes the statement, data storage containing code unique to the receiver, and then later it says a processor for processing receiver-identifying code received on a scanned radio channel with the unique code to determine whether transmissions on the scanned radio channel are intended for the receiver. Thus, code unique to the receiver, in addition to being unique... But none of that language detracts from the uniqueness of the code. When they talk about said code and that sort of thing, they have to be talking about a code unique. Well, let's turn back to the question, what does unique mean? It says a unique code is retrieved from the data store 12. And the specification then describes the data store 12 saying it may be in any convenient form, e.g. read-only memory, hardwired links, dual inline switches, etc. And dual inline switches, sometimes known as a DIP switch... If it said, you know, a nickname unique to Ray, that would mean the nickname is unique to me, not to something else. And there's only one of them. The unique to is what is causing me a problem with both your theory below and your theory here on claim construction. I understand. I believe that the word unique is susceptible to several meanings, and the one that you are connecting with is certainly a meaning of unique. But I think that that's not the only meaning of unique. Are we talking about the meaning of unique, or are we talking about what unique is tied to? It seems to me the district court's claim construction tied uniqueness to the receiver, and your construction would tie uniqueness to the transmitted codes. Am I just understanding it correctly? I think the purpose of the invention, which we have to go back and look at, is to prevent interference of the same transmitter on the same channel. What does uniqueness apply to? It applies to both the transmitter and the receiver. In order for the invention to work, there has to be a match between the unique code and a code which is transmitted by the transmitter. Now, Claim 15 says it's the identical code. Claim 1 doesn't require it to be the identical code. Your theory would work if the three words to the receiver were dropped out of the claim. If the receiver having a data storage containing a unique code instead of a code unique, then you'd be right. But you've got to live with those three little words, I think. We do have to, but we also should be allowed to look at the specification, and if a dual-in-line switch, which has a finite number of codes possible, is an embodiment of the data store 12, then we know that unique can be a finite number of possible possibilities. But aren't there multiple data points in the specification that the presiding judge alluded to that point in the other direction? It seems to me that you might have a data point, sort of like one scratch in the sand in the speck in your favor, but it seems to me that what I agree with the presiding judge is that the multiplicity of references in the way the patent is drawn is talking about the uniquenesses to that receiver. That's a cool idea. It's just that you can get around it by having your uniqueness in the transmitter instead of your receiver. I think putting a uniqueness in the transmitter or the receiver is not the issue because it's not a meaningful distinction. I appreciate the emphasis you want to put on the claim construction issue because you've got to get there, you've got to get the infringement flipped over so that you can get to the motion in limine and bring in the commercial success on your 103 argument. You said you had a second issue? Yes. On that issue of transmitter-based code or receiver-based code, I'd like to point out that the patent office didn't see that there was any distinction between those notions because the patent office, in its process, in its review of the application, entered this rejection over the Narasota patent, which arises in this red brief. It says, well, that's a transmitter-based code. The patent office felt it was the same thing. In fact, Narasota doesn't tell you where the code comes from. It's an automobile that probably has two separate situations where code is put into the key fob. I don't think anybody disagrees that both forms exist. The question is, which one did you claim? I think the district court did err by focusing on Mr. Wright's deposition testimony taken eight years after the filing of the patent application. That's extrinsic evidence. The intrinsic evidence of the dual in-line switch, I think, is much more compelling than Mr. Wright's testimony. I don't quite follow your argument about the dual in-line switch. I mean, obviously, if there are eight little switches, that means there's only a limited combination of ones and zeros that would work. That's correct, Your Honor. For example, if you have eight switches and you have 238 power, 256 possible codes. But I don't see how that affects the meaning of unique. Unique would just mean that each receiver would have one of those 256 codes. That's exactly the point I'm trying to articulate, which is 256 unique codes is all the uniqueness that's required for this invention, and therefore, when we look at the word unique, it does not mean absolute uniqueness, the only one in the universe, in the way that the district court construed code unique to the receiver. It just means that the code is unique enough in order to achieve the purposes of the invention, which is to avoid interference of two transmitters on the same channel. So as long as there aren't any other airplanes using that same one of the 256 numbers flying on a field at the same time, you're okay? That would be correct, and I would say that in that 256 embodiment, that would be okay. Typically, you might have 12, 24 people on the field at any one time in one geographic area, and 256 should be enough, at least according to the specification. It was at the time and place when the application was drafted that the inventor thought that was enough. If we disagree with that, we can certainly look to improvements in technology over time and make it possible to have more codes. As indeed, for example, Verizon itself has a finite number of codes in its receivers. Granted, it's, I think, 2.4 billion, which is a lot more than 256, but it's still a finite number of codes, not an infinite number of codes. And so when the district court says code unique to the receiver is absolutely unique, and it's impossible for it to be anything other than absolutely unique, therefore there's no infringement, I think that's just a hyper-attenuated reading of the claim without any realistic understanding of engineering considerations, inventor's considerations. We're talking about radio control models, which you only need a certain amount of uniqueness in order for it to be effective. Assume we agree with you on your claim construction theory and therefore agree with you that there was an insufficient basis for a finding of infringement. Does the switch in the claim construction impact the 103 analysis? Just so I can be clear, you can't decide that a claim is obvious until you know what the claim is, right? And in some instances we see up here the claim construction, when it flips, it just undermines the entire 103 analysis, as you say when you're looking at something entirely different. I didn't see any argument in your brief that the fundamental 103 analysis would change. You'd be entitled to a new trial on 103 because of the new claim construction. The new claim construction did not change the analysis of the prior art, but what would change is the fact that there's been significant commercial success by… Okay, I know. I just want to get that first point nailed down. Now, it seems to me, and you can correct me, that the district court sat there and listened to all the testimony. You basically got a competition going on between Dr. Fugia and Dr. Parsa, is the way I would say it to cut to the chase. And the district court says Dr. Fugia was clear, concise, and convincing. That's at A124. And Dr. Parsa was, however, at times defensive and less forthcoming and came across as less knowledgeable. That's at A125. So what am I to do with this take by the judge who's looking at the evidence and he's in essence telling me what he thinks the jury should have been hearing in terms of the credibility, the reliability of these two key witnesses? Isn't that really harmful to your case? I understand. I agree with you that the judge's statement is a whole… Unfortunate. …pointed at me. But I think also that that testimony and that comment is directed particularly at this second issue, the issue of anticipation, which is anticipation of the claim in view of the Brendel 839 patent. And so the judge may have made this comment that he may not have believed Dr. Parsa relative to Dr. Fugia. How do we know that the focus of the comment was on the anticipation? Because that was the testimony with respect to the trial below was only an invalidity trial. So we know we were talking about anticipation and obviousness. And the obviousness issue I hope we can address by reversing the claim construction. But the trial was as to both. As to both. Correct. So that's why I was wondering why the comment was necessarily limited to, say, for example, Dr. Parsa's testimony with respect to 102 as opposed to 102 and 103, testified as to both. You're right. It is for both. But it's not relevant to the claim construction issue or the infringement issue. I take it your main argument on 103 is not that the references, if combined, produce obviousness. It's that they shouldn't be combined. That they shouldn't be combined. That there is no motivation to combine the references. Wasn't there reference to the nature of the problem to be solved in essence? They're working towards the same goal. All these people who are working in this field are trying to use electronic signals to avoid collisions, interactions, whatever. That is correct. Your judgment is that's insufficient as a matter of law to permit a combination of the references? That's insufficient with respect to the fact that there's different technical domains or frequency domains involved and how you put them together. It's not just a simple matter of putting them together. There's much more required than that. Clearly someone who's working in the model art has to be aware at least of the art that opens and closes garage doors or opens and closes windows. I'm driving down the New Jersey Turnpike and all of a sudden my windows start going up and down. Because some guy in an ATV was talking about that. Let's assume I'm a model airplane person. Aren't I going to be aware of the fact that there are other fields that deal with transmissions that cause things to open, shut, avoid each other? I expect that that's correct. But in order to import technology from one frequency domain into a different kind of domain, there's a lot of engineering involved. It's not really an obvious combination to do. All right. Mr. McInerney, you've gone over your rebuttal time, but we'll be still your three minutes of rebuttal. Thank you. Let's hear from Mr. Bollinger, and we'll give you three additional minutes. Thank you, Your Honor. Good morning. Good morning. Please support. My name is James Bollinger, and I do represent Verizon, the Appellee, and Cross Appellant. Again, thank you. I'd like to reserve three minutes for rebuttal also. I am planning to address and had planned initially to address the plane construction issues, the non-infringement anticipation determinations by the jury, and also, obviously, in my open heart. But if there are any questions that the Court feels to direct me to, I'd be glad to try to address. Why don't you begin by addressing the question about the limited number of codes in the embodiment with the DIP switches. Let's just assume that there are only 256 combinations available. Wouldn't that mean that at any one particular time, there may be a model airplane flying in New York with code 101 and a model airplane flying in Chicago with that same code 101 just by happenstance? So that would not be unique. If you designed a receiver to be limited to 256 codes and then manufactured multiple receivers with the same code in multiple of those receivers, then you would not have a code unique to the receiver, and you would have a significant risk of interference in the real world because 256 in the modeling world is far insufficient for the number of units. It's something that, as I became involved in this case, learned that there is a significant group. It's a serious hobby to pay thousands of dollars for these units, for the planes. And it's one that involves international competition. So if you were concerned about a code being duplicated in multiple jurisdictions and thought that you were safe because you were only competing in the United Kingdom, let's say, you would be opening yourself up for the possibility of somebody coming from the U.S., the planes interfering with each other, and somebody being killed. And when you read the specification, the first point you note immediately is that there's absolutely no discussion about reprogramming or even limitations on the number of codes. So if one were to read the patent as suggesting that those switches would be there for the modeler to set at his or her discretion, that that would sort of defeat the whole purpose. If you were to read the patent with that variable, I think that you can't read the patent that way. And the reason I say that is because every other instance within the patent talks about specifically precluding the possibility that some other receiver will have that same code. It talks about the critical nature of making sure that if there is no interference, and the way you do that, you allow full, direct, continuous transmissions on multiple channels into these designs. And you can go to any channel you want. And the only thing that saves you from interfering with somebody else in that channel is the recognition that only your receiver on that channel has that code. And the way the patent talks about this design is that by doing it that way, you are assuring yourself that you will never have interference that is going to cause the type of problems that this patent was designed to defeat. And I think while counsel criticizes the discussion of the inventor about his consideration of both a transmitter-based code and the receiver-based code, which he considered before he filed his application, and that his decision was to go with the receiver-based code, and that was driven by his concern about the possibility of crashing, being the most dominant theme of what his, this was a safety device. He foregoed the flexibility that would be otherwise associated with the transmitter code to focus on that as his invention. And I think while the court did touch on that, it recognized there was extrinsic evidence. And it did focus on the two elements which I think are the key here, the two evidence in determining what unique meant. The first is the ordinary meaning. And there was no debate that the common ordinary meaning of this is one and only one. But also the intrinsic record, which clearly defined the purpose of this invention was to prevent two receivers from having the same code and preventing that from happening. Does Claim 1 have a preamble? I believe it does. Show me where it is. Where does the preamble end and where does the claim begin? That takes a little bit more effort than most claims. Well, because there's no comprising language or anything like that. Well, there's no comprising, but there's a word having. And my understanding, and I've seen these. Where are we in the text? The receiver having. So are you down at line 56 in column 3? Yes. So you say the receiver having. So does the preamble end with the word receiver? It would end, I think, with the word one radio channel comma. And then the transition is the receiver, which has now been introduced in the preamble, having. And then the rest of it would be the limitations defining what that receiver has, a processor. Right. But even so, even on that theory, wouldn't model, even if it were lying in the preamble, which it certainly strikes me is not, wouldn't that inform the meaning of receiver? It would define a field of use for a receiver. Well, it's a radio control receiver for receiving yada, yada, yada in a model. You know, not in a conveyor belt or not in a car window or not in a garage. It is a... To be quite honest with you, I don't buy your argument that there's a preamble. But even if there were one, I would think there's a pretty good argument that the word model would be lifted out of the preamble and breathing life into the claim. Since the whole invention is dealing with models from the get-go. The two, while the whole invention describes, the whole specification describes the use of a receiver. Well, if you're wrong on the preamble, so the model is a limitation of the claim, right? Right. Then you concede that the 102 verdict is wrong? That's still a close question. How can it be a close question? Has any invalidating reference got a model in it? No. If the model's a limitation, the game's up, right? There's no 102. The Brendel reference that we relied on does not mention a model. However, it describes a control data signal that could easily be used in a model. But that's not an adherency argument, is it? It's not always used in a model. It's not always used in a model. So how could that reference, because it doesn't include a model, how can it read on a model, limitation? I think that if it's a limitation, it's not a limitation that it actually physically has to be in the model. What was the rationale the district court judge used to sustain the 102 verdict on this particular issue? I think the rationale considered the issue of the claim construction and the use of the term in the model presented jury instructions that Ripmack's, over our objection, sponsored to the jury, which dealt with this particular issue. And it was their jury instruction and the jury. They certainly didn't tell the jury that you don't need to find, in order to anticipate, you don't need to find a reference with a model. That's not what the instruction said. Their claim, their request, the jury instruction, doesn't bear exactly on the point I'm talking about. The plaintiff's proposed instructions, which we objected to but were used, talked about that they needed to find that the signal could be used in a model. And that's how they presented it to the jury. And I think the jury concluded that it could be used in a model. Now, you're suggesting that to meet that in a model, it always has to be used in a model. It can't be adapted to be used in any other particular environment, like a crane or another type of machine. I wouldn't read it that way. I think to have anticipation, it has to have the capability to perform that function. And certainly in a model, I think it meets that. But I don't believe, and obviously our argument you disagree with, is that in a model there's a field of use limitation. While it's in what you would characterize as a preamble. So this technology that was in the prior art would invalidate, as a matter of anticipation, any patent for any use whatsoever that was used in the technology to control electrical engines. Because it could be used. So let's assume you've got a machine in your MRI where you have to get into the deals with people saving their lives and whatnot. Then this anticipatory reference you just cited, it wouldn't invalidate the patent on that MRI. I wouldn't go that far. Well, your logic was, if it could be used. That's like saying the dictionary teaches non-experient novels. That's the flaw in your theory. When you say something could be used, that means it anticipates something where it is used. It's too broad. It's on that fine line, but I think it's on the right side. The reason I say that is because the Brembo reference actually describes the type of control information that needs to be used to control multiple devices. It has to be used to control using a continuous signal. You have the luxury of a 103 that you can fall back to in this discussion. In that regard, I know that page 63 in your briefing, footnote 11, you tout detailed evidence, Song, to go to the combination of Song and Rosenhagen. And you cite one, two, three, four sites in the record.  I see your expert, Fuja, talking in great detail about what Song does and what Rosenhagen does, but he's not talking about why one would combine them. He does not actually state in his testimony that you should take these three elements from Song and combine them. That's why I'm picking on you a little bit, sir, for the words in your footnote where you say, Horizon offered detailed evidence, referring to Fuja, detailed evidence on this combination. The evidence that I was referring to there actually was the references themselves, the problems identified for Dr. Fuja regarding what those references were. Is the argument that those references within themselves teach one to combine them? They teach the overriding problem of interference and the speed to switch between channels, and specifically subjected with those teachings to a person of skill in this art. Remember, the skill level in this art is a double E, bachelor's, with five years of radio frequency experience. It's a fairly high level of skill. That person can bring some creativity and judgment to assessing these things and deciding that. A double E undergraduate degree? Yes. And that's high level skill? For this particular problem? Models may be high. Yeah. If you're talking about advanced computer systems and networks or cell phone transmissions and TDMA and things like that, maybe it's not as high. Mr. Bullinger, I want to get back to the preamble for just a second. Sure. Is it your view that nothing in the preamble is a limitation in the claim? Oh, no. No, no. There's clearly the arguments that were the language was added to the preamble and arguments that were made pursuant to the language that was added during the prosecution created limitations that were used to distinguish over the Narasata reference. That wasn't the inner model language also part of that? It was added, but it was not argued as a distinguishing feature over Narasata. It wasn't? I don't believe so. I mean, wasn't there some argument, Appendix 10075, where the argument made to the examiner is convention is intended to meet the problems encountered by radio control modelers caused by being a limited number of channels available for control of their models. The receiver is usually contained inside the model. None of this is addressed by Narasata. It seems to me that model was being argued as a distinction over Narasata. I actually read that and believe that the distinction was principally the format of the control data being distinguished over Narasata. If you look at the entire passage, they added a continuous transmission of control data in repeated frames and specifically added the language of multiple devices being controlled on a single radio channel and then said Narasata doesn't do any of that, and that's how they were made. You're just about into your rebuttal. If you want to say anything about inequitable conduct, now's the time, but be brief. Inequitable conduct is a decision, speaking somewhat in a vacuum, because obviously the court is now reviewing the entire framework of inequitable conduct law and how these cases will be assessed. I have the advantage of a little bit is that this was done on summary judgment. We're not exactly in a vacuum. The law is what the law is until we might say otherwise. That's true, too. We believe under the current law that a compelling evidence of inequitable conduct was shown, and in fact the ruling based by the district court in rejecting that was that there was no evidence of intent. We felt that in reviewing that decision there was three inferences we identify in our briefs that went, instead of giving them reasonable inferences to Horizon, they went directly against Horizon, and those were the inferences of the content of the withheld German translation. There's no debate that a German translation, an English translation of the German reference, Brendan, the anticipating reference, was acquired by Ritmax. The content is in debate and dispute. They found it wasn't in existence. And then two other inferences, which I'll try to address in my rebuttal time, but that's failing to provide those reasonable inferences in favor of the non-Ritman party was the error under Rule 56 that the court made in granting summary judgment. You're arguing that the mistake here was that the district court granted the wrong summary judgment, right? No, that's correct. We want summary judgment. Well, we moved for summary judgment initially. That's right, but you're not saying that the district court erred by issuing summary judgment because there are material issues of fact and dispute that need a trial. I am saying that. Really? That's the argument here. I understood you to be arguing you wanted flat out an S.J. in your favor. No, we don't think the record is as clear as to demonstrate summary judgment of inequitable conduct on these papers. Well, what are the facts that are in material dispute? The content, well, whether there exists a good faith belief by Ritmax that what their conduct was was appropriate. And that the court's determination of inequitable conduct in the context of the technology, I don't think the court, when it dismissed some of the incidents. Why is the result going to be different if there's a trial? This is an equitable issue tried to the bench. True. Do you have additional witnesses? Are there testimony you would provide that wasn't already given to the judge in the way of affidavits? We did. We had a legal expert to talk about some of the. . . But there's nothing more to be said if you had a trial, right? That's true. All right. Let's reserve your time, and we'll hear from Mr. McNamara. With regard to the anticipation issue, I think the point that we were discussing with Verizon's counsel with regard to the language that was added to the claim in prosecution that distinguished Narasata is very, very important because it clearly demonstrates structural features in the claim that define the receiver. The receiver is capable of receiving a particular code structure, a code structure for controlling a radio control model. The Brendel 839 patent does not have any of these code structure elements that are typical of a radio control model. And so it by itself certainly does not anticipate. Also, a very good inherency argument based on this combination with the other Brendel patent, an inherency doctrine applies to secondary effects, such as when you put lotion on your skin and you get a secondary effect, or you eat sprouts and you get a secondary effect that is suddenly discovered. That's inherency. It doesn't apply to cases about like the specific format of a radio control signal, which is something that's defined, engineered, not inherent in a particular transmitter or receiver design. The standard review on this anticipation issue would be, whether there's sufficient evidence that a reasonable jury could have returned a verdict. Here there's no evidence from which a reasonable jury could have returned a verdict that Brendel discloses a radio control model structure or signal structure. And so despite the court's commentary that he didn't leave Dr. Parsa, if you just look at the references themselves, credibility doesn't become... But you still have to clear the 103 hurdle as well. I mean, you can clear the 102 hurdle, and if your claims ensued are going down on 103, it's a distinction on the difference. That is, you're right, that's a separate... And that's really the Achilles heel, isn't it? That's the weak point. That's the weak point in your case. Because there is testimony, albeit thin, from the expert, saying that he believes that you'd put the references together because they're all so-called solving the same problem, essentially, although in different fields. Yes, there's definitely a disagreement between the experts, and yet, of course, we think if... And your case has to come down to us to say that testimony, as I've just related it, assuming it's a faithful summation of what actually happened, that's insufficient as a matter of law for this case and any other case. That is correct. And lastly, as to inequitable conduct, there's just no evidence of any intent to mislead. So the district court was correct in its conclusion. Thank you. Thank you very much. Mr. Berlinger, there really is... One minute. You have one minute to comment on the absence of intent. Okay. The evidence of intent that we believe is... When did the intent take place? It took place when the U.S. examiner issued and was clear to everybody that he had missed the ISR. The ISR was a record. It identified the German reference, the other references that were critical, clearly relevant, ex-designated. Everybody with knowledge of patent on the RITMAC side clearly would have recognized at that point that the examiner made a mistake and erroneously believed that he was now in a position to argue for validity or for patentability over a very weak reference, Narasata, using arguments that he could not make and that were contrary to prior art that he was aware of. That's where the evidence of intent takes place. But wait, prior art he was aware of. I thought he said, I never saw the translations. I didn't know what was in them. He testified to that. But right, the inventor said he passed on the translations to Weitzel, the attorney prosecuting this case. And Weitzel prosecuted other patents. So you're saying even though the references were in front of the PTO examiner because they're stuffed in on this international application, because the inventor, through his counsel, has got a translation, that you say means that it undercuts the arguments that the prosecutor was making to the patent on it. Yeah, it actually renders those arguments inconsistent with what he knows the facts to be, which is that when he's arguing this new invention includes its features. Was there testimony that the prosecuting attorney had read these translated references? Most of the testimony from the prosecuting attorney was blocked because it was under U.K. privilege. Well, that's fine. So your answer to my question is no. The answer is no, there wasn't. So there's no evidence in record that the prosecuting attorney was aware of the contents of the translated documents. Yes, there is evidence of record. The fact is that the record shows that he got the foreign language references at designated X. He said, well, we don't want it to get translated. It was reported back to him as being translated, what the translation said. And he's just saying, I don't remember anything about it. That's the only record. And any detail I wanted to get into was blocked because it was a U.K. Well, I understand that. But, I mean, maybe somebody can hide behind, I don't have any recollection. But your point is that you need a mighty big inference. That is to say, I'm going to infer that the U.S. prosecuting attorney not only received the translations, but he read them and he dug them and he understood that in possession of that information, he couldn't, under the duty of candor, make certain arguments to the PTO that he made. But the guy says, I never knew it. But it's even beyond that because it's not just the translation where that information resided. There were three other references we identified that were not untrue. The song reference. There were other, the 980 patent. He had those. There's no question those were in his possession in English that described scanning tuners. The other patents, the 980 talked about plural device channels on a common radio channel. What was the prosecuting attorney's explanation as to why he didn't turn those documents over? There wasn't. I never provided that. All right. Well, thank you very much for your argument. The case is submitted. The court will stand in recess for a brief period.